IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | | |
|---|---|---|
| TIMOTHY DOTSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:04-CV-452 |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This is an action for judicial review, pursuant to 42 U.S.C. § 405(g), of

defendant Commissioner's final decision denying plaintiff's claim for disability insurance

and Supplemental Security Income ("SSI") benefits under Titles II and XVI of the Social

Security Act. For the reasons provided herein, defendant's motion for summary judgment

[doc. 15] will be granted, and plaintiff's motion for summary judgment [doc. 13] will be

denied. The final decision of the Commissioner will be affirmed.

I.

*Procedural History*

Plaintiff was born in 1981 and has either a tenth [Tr. 48, 125] or eleventh [Tr.

170, 251] grade education. He applied for benefits in September 2002, claiming to be

disabled by "learning disability . . . trouble reading and a limited education. . . . Cannot read

past third grade level. Cannot concentrate on more than two things at a time." [Tr. 96, 107,

119, 164]. Plaintiff alleges a disability onset date of December 1, 2001, which is evidently the date that he "went for a job and was turned down." [Tr. 96, 107, 119]. The Social Security applications were denied initially and on reconsideration. Plaintiff then requested a hearing, which took place before an Administrative Law Judge ("ALJ") on December 17, 2003. [Tr. 18, 43].[1]

On February 3, 2004, the ALJ issued a decision denying benefits. Therein, he found that plaintiff suffers from "affective mood disorder, arthralgias in the back and right shoulder, asthma, social phobia, and borderline intellectual functioning," which are "severe" impairments but not equivalent, singularly or in concert, to any impairment listed by the Commissioner. [Tr. 19]. After reviewing all the evidence of record [Tr. 18], the ALJ found that plaintiff retained the residual functional capacity

> to perform light work lifting 20 pounds occasionally and ten pounds frequently, standing and/or walking for six hours in an eight-hour day, and sitting for two hours in an eight-hour day; avoiding more than occasional bending and stooping; avoiding more than occasional reaching overhead with the right arm; avoiding concentrated exposure to dust, fumes, smoke, chemicals, and noxious gases. The claimant has moderate limitations in relating to coworkers, using judgment, dealing with work stresses, functioning independently, maintaining attention and concentration, demonstrating reliability, and understanding, remembering, and carrying out detailed instructions.

[Tr. 22]. Relying on vocational expert testimony, the ALJ concluded that plaintiff is able to perform a significant number of jobs existing in the national economy. [Tr. 23]. Plaintiff

---

[1] The administrative transcript in part bears a date of December 17, _2002_ [Tr. 41, 43, 65], which the court presumes to be a typographical error.

was accordingly found "not disabled."

Plaintiff then sought review from the Commissioner's Appeals Council, arguing that "my physical, emotional, [and] intellectual conditions and pain prevent me from working." [Tr. 12]. Review was denied on August 6, 2004. [Tr. 5].[2] The ALJ's ruling therefore became the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481. Through his timely complaint, plaintiff has properly brought his case before this court for review. *See* 42 U.S.C. § 405(g).

## II.

### *Relevant Background*

Plaintiff states that his limited reading skills prevent him from performing more than "easy" jobs. [Tr. 119]. He has stated that "I'm having a lot of problems finding jobs because I can't read or spell or do things as fast as other people." [Tr. 375]. He has "[d]ifficulty with jobs, because he's afraid he'll be asked to do something he doesn't know how to do." [Tr. 375].

Plaintiff does not have, and has never had, a driver's license. [Tr. 48].[3] He stated that he stopped working at his last job because "without a car or driver [sic] license

---

[2]  Plaintiff submitted additional psychological and academic evidence subsequent to the ALJ's decision. The Appeals Council described the late-submitted evidence as cumulative and/or duplicative. [Tr. 5-6]. In pertinent part, the Council also commented that "the record reflects that while you have significant intellectual and mental limitations, and corresponding functional limitations, the evidence does not support an inability to perform the basic functions of work activity." [Tr. 6].

[3]  Plaintiff cites the court to no explanation as to why he has never obtained a driver's license.

3

I was unable to keep my job." [Tr. 119].

Plaintiff purportedly suffers from back and shoulder pain. [Tr. 51]. He treats these complaints with "Icy-Hot," a heating pad, and over-the-counter medication. [Tr. 52, 152-53, 234]. Plaintiff is nonetheless able to vacuum, mop, sweep, clean carpet, carry groceries, and lift weights three times per week. [Tr. 54, 153, 423].

Plaintiff testified that he is too "scared and nervous" to go out in public due to a concern that he is "always being talked about and looked at[.]" [Tr. 55]. He therefore purportedly spends his days sleeping, playing with his cat, watching television, listening to the radio, and playing video games. [Tr. 55-56, 145-47]. He alleges occasional suicidal ideation. [Tr. 58-59].

## A. Physical

The records of Dr. William Hicks reflect that by the age of fifteen plaintiff had complaints of back pain and a diagnosis of mild scoliosis. [Tr.301]. Dr. Hicks' records further show that by that early age plaintiff's mother had already voiced the opinion that plaintiff "may be 'disabled.'" [Tr. 301]. The doctor described plaintiff at that time as having "very poor physical conditioning" and "no physical activities, 'just watches T.V.'" [Tr. 301] (emphasis in original).

Dr. Jeffrey Summers performed a consultative physical examination in May 2002. Plaintiff was noted to be "applying for disability benefits due to 'problems with my back and neck.'" [Tr. 344]. Dr. Summers concluded that

4

he has a mild decrease in range of motion at his lumbar spine. No significant abnormalities of his cervical spine are noted. Based on these findings, it is reasonable to expect that he will have difficulty with bending, stooping, or lifting greater than 20 lbs. He should tolerate all other work related activities in this regard. There are no objective findings to support additional impairments at this time.

[Tr. 346].

Dr. K. Shannon Tilley produced a physical RFC in May 2002. Dr. Tilley considered plaintiff's complaints of pain to be "partially credible." [Tr. 349]. Dr. Tilley predicted that plaintiff could nonetheless lift up to fifty pounds occasionally, twenty-five pounds frequently, and sit or stand for six hours each per workday. [Tr. 348].

The records of Dr. Warren Sayre reflect continued complaints of intermittent right shoulder and back pain in 2002. [Tr. 423]. Examination revealed some tenderness and spasm. [Tr. 423]. Dr. Sayre recommended Naprosyn, stretching exercises, and use of a heating pad. [Tr. 423]. Dr. Sayre later commented that plaintiff followed these recommendations "sporadically" and "occasionally," purportedly without effect. [Tr. 421].

## B. Mental

Plaintiff has been diagnosed with attention deficit disorder and has been treated with Ritalin. [Tr. 310]. The administrative record includes a July 2002 intake evaluation from Ridgeview Psychiatric Hospital and Center, Inc. ("Ridgeview") with impressions of borderline intellectual functioning and depression. [Tr. 358-69]. In the intake interview, plaintiff characterized his chief complaint as "I have a hard time around a group of people and I'm a slow learner." [Tr. 358]. Plaintiff reported no problems with activities of daily

5

living. [Tr. 361]. In a notation to which plaintiff attaches paramount importance, the Ridgeview interviewer checked "no" beside the "strengths/barriers" category of "Potential for employment / return to school." [Tr. 362].[4]

The same box was again checked "no" on a July 2003 intake form. [Tr. 413]. In addition, plaintiff was described therein as having difficulty with activities of daily living because he "gets afraid [and] stays in bed all day sometimes[.]" [Tr. 412]. Subsequent Ridgeview notes contain a diagnosis of "social phobia," and plaintiff is described as "very anxious but able to engage." [Tr. 408]. At a later Ridgeview appointment (which was noted to coincide with the "disability hearing this week"), plaintiff reported increased anxiety and suicidal ideation because he "was told he might have to get rid of his cat." [Tr. 424].

Mary Barker, M.S., and psychologist Helen Smith produced an April 2002 "Psychological Report and Mental Status" following examination. [Tr. 322-26]. The evaluators predicted moderate impairment in adaptation, understanding, and remembering. [Tr. 325]. They predicted mild impairment in concentration, persistence, and social interaction. [Tr. 325]. Subsequent Residual Functional Capacity Assessments ("RFC") also

_____

[4] It is unclear to what extent this notation reflects the interviewer's initial impression or to what extent the notation is a mere recitation of plaintiff's self-report. Nonetheless, plaintiff's summary judgment brief repeatedly stresses the alleged importance of this event. ("On July 16, 2002, he was _found_ to have no potential for employment or return to school . . . ." [Doc. 14, p.10] (emphasis added); "Ridgeview _psychological experts_ found Mr. Dotson had no potential for employment or return to school on July 16, 2002. . . . They _found_ he is a person who has no potential for work or school." [Doc. 14, p. 15] (emphasis added); "To determine he was able to work, the judge had to place little if any weight on . . . the treating psychological providers, _those who knew the plaintiff the best_." [Doc. 14, p. 18] (emphasis added).

6

did not predict any limitations of more than a moderate degree. [Tr. 341-43, 394-96].

## C. <u>Academic and Vocational</u>

Plaintiff's high school records reveal an academic classification of "learning disabled" with deficiencies in "basic reading, written expression, [and] math calculation." [Tr. 198]. He participated in both special education and general curriculum. [Tr. 199]. Reading and writing skills were described as "so deficient that he cannot succeed in classes in the regular curriculum[.]" [Tr. 211].[5] Problems were noted in comprehension, work habits, social maturity, and following directions. [Tr. 200]. All IQ tests of record place plaintiff in the borderline range of intellectual functioning. [Tr. 324-25, 398-99].[6]

Plaintiff has worked as a cleaner, security guard, and grocery bagger. [Tr. 120, 233]. He testified that he quit the cleaning job because of allergic reactions to dust, chemicals, "and stuff." [Tr. 49]. He testified that his security guard employment ended because "[t]hey just said I wasn't doing my reports right, which I probably wasn't, but I couldn't read and spell and everything." [Tr. 50].

Lastly, the record contains an Employment Report, in question and answer format, completed by the owner of plaintiff's former employer, Xpert Cleaning, Inc. Due to its extraordinary relevance, the court will quote the report in its entirety.

---

[5] Plaintiff purportedly reads at a second to third grade level. [Tr. 164, 226].

[6] Plaintiff does not contend that he satisfies the Commissioner's mental retardation listing, which in part requires a valid IQ score *below* the borderline range. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C.

Q1: Did the individual report to work on time?

A: Always.

Q2: Was the individual's work attendance satisfactory?

A: Was sick often.

Q3: Was the individual able to maintain an ordinary work routine without supervision?

A: Yes.

Q4: Were most absences due to a "nervous" condition?

A: No.

Q5: Did the employee require frequent breaks or rest periods for stress related reasons?

A: No.

Q6: Was the employee able to understand and carry out simple one- or two-step instructions?

A: Yes.

Q7: Was the employee able to understand and carry out detailed instructions?

A: Yes.

Q8: Could the employee ask simple questions and request assistance?

A: Yes.

Q9: Was the individual able to maintain attention and concentration to assigned tasks for extended periods?

A: Yes.

Q10: Could the individual perform assigned tasks at a consistent pace?

A:   Yes.

Q11: Was the employee able to make simple work related decisions?

A:   Yes.

Q12: Was the individual able to work in coordination with or proximity to others without being distracted by them?

A:   Yes.

Q13: Was the individual able to work with or in proximity to coworkers without distracting them?

A:   Yes.

Q14: Was the employee able to maintain socially appropriate behavior and grooming?

A:   Yes.

Q15: Was the employee able to respond appropriately to changes in the work [sic]?

A:   Yes.

Q16: Did the individual take necessary precautions around usual work hazards?

A:   Yes.

Q17: Was the individual able to accept instructions and respond appropriately to criticism from supervisors?

A:   Yes.

Q18: Did the employee respond appropriately to the normal stresses involved in carrying out the assigned tasks?

A:  Yes.

Q19: Did the employee ever refuse to complete tasks or leave work for stress related reasons?

A:  No.

[Tr. 132-34].

## D. Evidence Submitted to the Appeals Council

As noted, plaintiff submitted seventeen pages of documentation to the Appeals Council.  His accompanying cover sheet refers to the papers as "additional evidence."  [Tr. 425].  Seven of the pages, however, are duplicates of academic records that were originally filed prior to the administrative hearing.  [Tr. 442/205; 441/199; 440/200; 439/202; 438/203; 437/208; 436/210].

The remaining ten pages are Ridgeview counseling notes.  Two of those ten pages were also already a part of the administrative record considered by the ALJ. [Tr. 427/424; 426/406].  The remaining pages document that from March through May, 2004, plaintiff continued to receive counseling for his complaints of anxiety, social phobia, and depression. [Tr. 428-35].

III.

*Vocational Expert Testimony*

Vocational expert Jane Colvin-Roberson ("Ms. Colvin-Roberson" or "VE") testified at plaintiff's administrative hearing.  The ALJ offered the following vocational hypothetical:

> Let's assume that the Claimant is limited to a range of light work.  That because of some arthritis he has, he would be precluded from doing any more than occasional stooping or bending.  He also shouldn't do any more than occasional reaching overhead with his right arm because of the problems he has with his shoulder.  He would have some difficulties with working around dust, fumes, smoke, chemicals, or noxious gasses, so he shouldn't have any concentrated exposure to those irritants.  And he would have because of the emotional difficulties that he indicates a moderate restriction in his ability to relate to coworkers, to use judgment, to deal with work stresses, to function independently, to maintain attention and concentration, to understand, remember, and carry out detailed instructions, and to demonstrate reliability.  He would have a marked restriction in his ability to deal with the public.  Given these restrictions and taking into account the Claimant's age, education, and the work he has done . . . would there be any jobs in the regional or national economy that he could do with these limitations?

[Tr. 62].

Ms. Colvin-Roberson responded that the hypothetical worker could perform the jobs of laundry press operator (light - 810 jobs regionally, and 214,000 nationally) and assembler (light and sedentary - 3,190 jobs locally, 1,189,840 nationally). [Tr. 62-63].  If the hypothetical emotional restrictions were increased from "moderate" to "marked," no employment would be available.  [Tr. 64].  If the worker were "unable to get to work" four days per month, "the ability to persist on the job would be a significant problem." [Tr. 64].

11

IV.

*Applicable Legal Standards*

This court's review is confined to whether the ALJ applied the correct legal standards and whether his factual findings were supported by substantial evidence. 42 U.S.C. § 405(g)*; Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)). The substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted).

A claimant is entitled to disability insurance payments if he (1) is insured for disability insurance benefits, (2) has not attained retirement age, (3) has filed an application for disability insurance benefits, and (4) is under a disability. 42 U.S.C. § 423(a)(1). "Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

12

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).[7]   Disability is evaluated pursuant to a five-step analysis summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters*, 127 F.3d at 529 (citing 20 C.F.R. § 404.1520 (1997)).  Plaintiffs bear the burden of proof during the first four steps.  *Walters*, 127 F.3d at 529.  The burden shifts to the Commissioner at step five.  *See id.*

_____

[7] A claimant is eligible for SSI benefits on the basis of financial need and either age, blindness, or disability.  42 U.S.C. § 1382.  "Disability," for SSI purposes, is defined the same as under § 423.  42 U.S.C. § 1382c(a)(3).

## V.

### *Analysis*

Accusing the ALJ of "selective inclusion" and "misinterpretation" of the record, plaintiff raises a wealth of issues on appeal:

1. Evidence submitted to the Appeals Council warrants remand.

2. "The ALJ misread the record in finding Mr. Dotson took care of his grandmother."

3. "The ALJ erred in the weight given to the plaintiff's psychological condition and intellectual limitations."

4. "The ALJ did not follow the requirements of SSR 00-4p."

5. "It was error to find the plaintiff not credible."

The court will address these arguments in turn.

### A. Sentence Six

The Appeals Council considered plaintiff's additional evidence but denied his request for review. [Tr. 5-6].[8] "[W]here the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the

---

[8]

. . . The Appeals Council has considered the additional evidence and your statement. However, the medical evidence submitted is cumulative in that it shows an ongoing treatment for your impairments. The school records submitted are duplicates of Exhibit 14E, which were part of the record considered for the hearing decision. . . . The Appeals Council concludes that the hearing decision is supported by the weight of the evidence currently of record, and that this information does not provide a basis for changing the Administrative Law Judge's decision.

[Tr. 6].

14

district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision." *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996) (citation omitted).

This court can, however, remand a case for further administrative proceedings, but only if the claimant shows that his evidence meets each prong of the "new, material, and good cause" standard of sentence six, 42 U.S.C. § 405(g). *Id.* Sentence six mandates that, before a claim will be remanded for consideration of additional evidence, the new evidence must be material and there must be good cause for the failure to present it at the hearing level. *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988). The claimant bears the burden of proof. *Id.*

As noted, plaintiff's late-submitted academic records (and twenty percent of the Ridgeview records) are duplicates of documents already on file as of the date of the administrative hearing. This portion of plaintiff's "new" evidence therefore does not even satisfy sentence six's "newness" requirement.

As for the remaining eight pages of Ridgeview counseling notes, plaintiff contends that "[t]hey are more than cumulative as it was important to establish that the psychological problems were continuing and over a long period of time." [Doc. 14, p. 14]. The court does not agree. These additional records in fact document a *brief* period of counseling (March through May, 2004) regarding plaintiff's continued complaints of anxiety, social phobia, and depression. [Tr. 428-35]. These restated subjective complaints were

15

previously considered by the ALJ. Cumulative evidence is not "material." *Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 149 (6th Cir. 1990). To show materiality, a claimant must demonstrate a "reasonable probability" that the ALJ would have reached a different decision if presented with the new evidence. *Sizemore*, 865 F.2d at 711. The court does not see a "reasonable probability" that plaintiff's new evidence would cause the ALJ to change his mind.

Therefore, with each strain of evidence, plaintiff has failed to satisfy at least one prong of the "new, material, and good cause" standard. His request for sentence six remand must accordingly be denied.

### B. "Sitting for," and "Taking Care of," His Grandmother

Plaintiff next contends that "[t]he ALJ misread the record in finding Mr. Dotson took care of his grandmother." [Doc. 14, p. 14]. Plaintiff goes on to accuse the ALJ of "misinterpretation" and "selective inclusion" of the evidence in order to disregard the purported inability to live independently. [Doc. 14, p. 14-15].

In pertinent part, the ALJ's decision notes that plaintiff reported "taking care of" and "sitting for" his grandmother. [Tr. 22, 20]. In both cases, this language is employed in reference to the consultative psychological report, which documented plaintiff's statements that he "stays with his grandmother a lot. . . . and says that he house sits for his grandmother. He says he does not have to do a lot when he does that, but take care of her pets." [Tr. 323]. The court notes that elsewhere in the record plaintiff acknowledged "cleaning Grandma[']s

16

apartment [and] tak[ing] care of her bird," [Tr. 146], along with sweeping, mopping, vacuuming, and cleaning carpet. [Tr. 54].

The ALJ's "taking care of" and "sitting for" statements were not made, as plaintiff alleges, in the context of determining whether or not he is capable of living independently. Instead, the statements appear in a discussion of plaintiff's vocational capabilities in light of his demonstrated activities of daily living. Regardless of whether these activities in fact rise to the level of "taking care of" another person in the most traditional sense, the semantic technicality is irrelevant. The context of the ALJ's discussion constitutes neither a misreading, selective inclusion, nor misrepresentation of the record as shown by plaintiff's admitted activities of daily living.

## C. Mental Limitations

Plaintiff next levels a series of criticisms purportedly illustrating that "[t]he ALJ erred in the weight given to the plaintiff's psychological condition and intellectual limitations." [Doc. 14, p. 15]. These criticisms are unacceptably presented in cursory and unsupported fashion. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (citation omitted). The court will nonetheless briefly address several of these subissues, as they illustrate the particularly frivolous nature of plaintiff's mental limitations argument.

17

Citing two Ridgeview intake evaluations, plaintiff claims that "[t]he *experts* at Ridgeview describe him as person [sic] who could not live independently. They *found* he is a person who has no potential for work or school." [Doc. 14, p. 15] (emphasis added). For numerous reasons, plaintiff errs in his overly ambitious characterization of these forms. Initially, the court seriously questions whether the hospital's intake interviewers may properly be termed "experts." Further, as noted above, it is wholly unclear to what extent either notation reflects the interviewer's "findings" or to what extent the notations are mere recitations of plaintiff's self-report. Also, the cited forms merely ask whether various considerations are "strengths" or "barriers" - not whether the subject has, in plaintiff's words, "no potential" regarding the particular skill.

Most importantly, even if the cited checkmarks in fact represent the "findings" of treating "experts," the evidence is of limited importance. The ultimate issue of "disability" or "inability to work" is reserved to the Commissioner, not the treating source. *See* 20 C.F.R. § 404.1527(e)(1). Further, the opinion of a treating source is entitled to controlling weight only if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record[.]" 20 C.F.R. § 404.1527(d)(2). The present record does not suggest that either Ridgeview intake interview was the product of "medically acceptable clinical and laboratory diagnostic techniques." Also - obviously - neither form was the product of a treating relationship, but rather was a mere initial interview. *See id*. (The value of a treating

18

source is the provision of "a detailed, longitudinal picture of your medical impairment(s)[.]").

Next, plaintiff cites the consideration that he has never had a driver's license. He offers, however, no objective evidence connecting this fact to any aspect of his purported disability. "[I]ndividual considerations extrinsic to the disability itself cannot enter into a finding of disability." *Harmon v. Apfel*, 168 F.3d 289, 293 (6th Cir. 1999). "The travel factor that plaintiff contends is relevant to [his] disability determination is therefore an extrinsic factor . . . [and] *the law is clear* that we may not base our decision on plaintiff's argument." *Id.* (emphasis added).

Plaintiff next accuses the ALJ of "select[ing] out a single reading" of one Global Assessment of Functioning ("GAF") score from his file, thereby ignoring all other (lower) scores of record. This argument is particularly frivolous. *See Young*, 925 F.2d at 149 (arguments misstating the record below are "patently frivolous"). The administrative decision in fact cites three different GAF assessments - and not a "selected out ... single reading" as alleged by plaintiff. [Tr. 20-21].[9] Regardless, the GAF Scale "does not have a direct correlation to the severity requirements in [the Commissioner's] mental disorders listings." 65 Fed. Reg. 50746, 50764-65 (2000).

_____

[9] Plaintiff's counsel is once again admonished to conduct more than a cursory reading of her clients' administrative records before accusing Administrative Law Judges of "misstating" and "selectively including" those same records. *See Moore v. Barnhart*, No. 3:03-CV-335, slip op. at 16-17 (E.D. Tenn. July 19, 2004); *Simmons v. Barnhart*, No. 3:03-CV-583, slip op. at 15 n.5 (E.D. Tenn. Jan. 5, 2004); *Phillips v. Barnhart*, 3:01-CV-581, slip op. at 13-14 n.3 (E.D. Tenn. Mar. 13, 2003).

19

Next, and again without citation to supporting authority, plaintiff states that he "does not have 'marginal' literacy as claimed by the ALJ. The ability to read at [sic] second grade level is identified as illiterate, not marginal." [Doc. 14, p. 16]. Plaintiff's position is the mirror opposite of the pertinent law:

> (1) *Illiteracy*. Illiteracy means the <u>inability</u> to read or write. We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, <u>an illiterate person has had little or no formal schooling</u>.
>
> (2) *Marginal education*. Marginal education means ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs. <u>We generally consider that formal schooling at a 6th grade level or less is a marginal education</u>.

20 C.F.R. § 404.1564(b) (emphasis added). Based on plaintiff's repeated admissions that he can both read and write at least at a second grade level, including his admissions that he can "read English" and "write more than [his] name in English" [Tr, 118], the ALJ's finding of "marginal" literacy is correct.

In sum, the court cannot agree with plaintiff's insistence that "[t]he conclusion of the ALJ that Mr. Dotson had only moderate limitations in relating to coworkers, functioning independently and demonstrating reliability is contrary to the record." [Doc. 14, p. 16]. The court finds that the ALJ's conclusions, and his vocational hypothetical, were consistent with the objective evidence of record - the mental consultative examination and the mental RFCs - and incorporated plaintiff's educational background.[10] Plaintiff cites no

---

[10] In addition, the court notes that the ALJ's conclusions are supported by the Xpert
(continued...)

non-subjective evidence specifically establishing any limitation of more than a moderate degree. The ALJ's mental findings were supported by substantial evidence and may not be reversed.

## D. SSR 00-4p

Plaintiff correctly points out that the ALJ failed to comply with the Commissioner's Policy Interpretation Ruling 00-4p. *See* SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000). Ruling 00-4p was issued to clarify the Commissioner's standards for the use of vocational expert testimony.

> When a VE or VS provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT [Dictionary of Occupational Titles]. In these situations, the adjudicator will:
>
> Ask the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT; and
>
> If the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

*Id*. at *4. It is clear from the administrative transcript that the ALJ did not ask the VE whether her testimony pertaining to the cited jobs of assembler and laundry press operator were consistent with the DOT descriptions for those jobs. The ALJ's failure to do so was error.

---

[10](...continued)
Cleaning, Inc. Employment Report, which evidences that plaintiff's abilities are not nearly as limited as he alleges. Although the ALJ did not expressly discuss this Employment Report, his decision makes clear that he "review[ed] all of the evidence of record[.]" [Tr. 18].

21

The court, however, finds the error to be harmless *in the present case*. Social Security appeals are subject to substantial evidence review - a standard for remand not typically satisfied by the mere citation to some minor procedural shortcoming. *See Wright v. Massanari*, 321 F.3d 611, 616 (6th Cir. 2003). In many instances, the Commissioner's failure to comply with every one of her myriad regulations amounts to nothing more than harmless error.

> So the administrative law judge's opinion is vulnerable. But that is nothing new. [Nonetheless], [n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is a reason to believe that the remand might lead to a different result.

*Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) (citations omitted).

In the present case, plaintiff fails to even suggest a possible conflict with the DOT descriptions, nor does he suggest that the VE's testimony was so vague that he is unable to discern which DOT job descriptions are at issue. The court is confident that, were there indeed even arguably a potential conflict with the DOT, plaintiff's experienced counsel would have raised that issue in her brief.[11] SSR 00-4p accordingly does not warrant remand.

---

[11] In the only factual reference present in this portion of his brief, plaintiff states:

The positions the plaintiff could perform under the hypothetical included both sedentary and light level work. Yet the judge restricted the plaintiff to sitting for two hours in an eight hour day. It is not clear whether the VE was considering the inability to sit more than two hours in an eight hour day in her opinion.

[Doc. 14, p. 16-17]. Plaintiff refers to the fact that the ALJ's hypothetical did not contain a restriction on sitting, but his written opinion did. [Tr. 22, 24] (stating that plaintiff retains the capacity for "sitting for two hours in an eight-hour day[.]").

(continued...)

E. Credibility

Lastly, plaintiff argues that the ALJ did not sufficiently explain his conclusion that "[t]he claimant's allegations regarding his limitations are not totally credible." [Tr. 22]. Plaintiff offers both specific and general criticism of this conclusion.

Specifically, plaintiff first argues that the ALJ "claimed no episodes of decompensation but they were identified by DDS." [Doc. 14, p. 17]. In his discussion of the Commissioner's § 12.04 and 12.05 listings, the ALJ stated that plaintiff "experiences no episodes of decompensation." [Tr. 22]. This conclusion was apparently based upon the latter of two Psychiatric Review Techniques ("PRT") performed by DDS physicians. The latter PRT, as adopted by the ALJ, noted no episodes of decompensation [Tr. 390] whereas the initial PRT noted "one or two" episodes of decompensation. [Tr. 337]. The court questions the relevance of plaintiff's argument in light of the fact that even "one or two" episodes of decompensation do not rise to listing level severity.

---

[11](...continued)
The court again finds any alleged error to be harmless. Plaintiff specifies no arguable discrepancy with the DOT. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson*, 125 F.3d at 995-96. Further, the medical evidence discussed by the ALJ [Tr. 21] does not support a sitting restriction. The court therefore presumes that the inclusion of a two-hour per workday sitting limit was a typographical error, particularly in light of plaintiff's admission that he can sit for "a couple hours" *at a time* before needing to change positions. [Tr. 56]. Again, "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is a reason to believe that the remand might lead to a different result." *Fisher*, 869 F.2d at 1055.

Plaintiff next alleges that the ALJ erred in describing the mental health treatment as having been only "recently" begun. [Tr. 22]. Plaintiff argues that the treatment in fact started almost two years prior to the administrative hearing. In reviewing this issue, the court finds the following hearing testimony to be particularly illuminating:

ALJ: Okay. Now what kind of treatment do you get for this problem that you have with seeing people in the public and being around folks?

Plaintiff: I'm going to Ridgeview right now.

ALJ: **How long have you been going to Ridgeview?**

Plaintiff: **Not real long. Few weeks, maybe a month**, somewhere around there.

ALJ: Okay. **Did you get any treatment before that?**

Plaintiff: **No.**

[Tr. 51] (emphasis added). Although plaintiff underwent Ridgeview intake interviews in 2000, 2002, and 2003, and participated in a brief period of counseling in August 2003, the record contains: (1) *no* evidence of mental health <u>treatment</u> "almost two years before the hearing;" ***and*** (2) plaintiff's hearing testimony - as accurately cited by the ALJ - that his mental health treatment began only recently. Plaintiff's argument is accordingly - at a minimum - without merit. *See Young*, 925 F.2d at 149 (arguments misstating the record below are "patently frivolous").

Lastly, the court rejects the general contention that the ALJ's credibility finding was inadequately explained. The administrative decision discusses the record at length. The

24

objective evidence therein (from medical examinations to plaintiff's activities of daily living) substantially supports the conclusion that the complaints of total disability lack objective corroboration.[12] *See generally Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592-93 (6th Cir. 1987). Perhaps a different factfinder could have reached a different conclusion, but that is not the standard of review binding this court. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir.1993).

The final decision of the Commissioner will be affirmed. An order consistent with this opinion will be entered.

ENTER:

<u>       s/ Leon Jordan       </u>
United States District Judge

---

[12] Also, as noted above, the ALJ's decision followed a review of "all of the evidence of record[.]" [Tr. 18]. Such review would have considered, *inter alia*, plaintiff's admission that he can perform "easy" jobs [Tr. 119], along with the Xpert Cleaning, Inc. Vocational Report which dramatically undercuts the veracity of plaintiff's self-limitations.